IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Criminal No. 1:08-CR-0041 |
| : | |
| v.  : | **JUDGE SYLVIA H. RAMBO** |
| : | |
| **TRISTAN GREEN** : | |

## **M E M O R A N D U M**

Before the court is Tristan Green's motion to suppress the physical evidence and statements that were the product of a search and seizure by agents of the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). For the reasons that follow, the motion will be granted.

**I.     Background**

   **A.     Procedural Background**

Tristan Green and his co-defendant Otis Montgomery were indicted by a grand jury on January 30, 2008. Count I of the indictment charges Green with conspiracy to make false statements to ATF in the purchase and transfer of firearms to a convicted felon, in violation of 18 U.S.C. § 371. In Count II of the indictment, Green is charged with knowingly making a false and fictitious written statement in the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2), and § 2. In Count III, Green is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Counts IV and V charge Green with impeding an ATF agent engaged in official duties, in violation of 18 U.S.C. § 111.

Montgomery filed a motion to suppress the physical evidence and statements obtained as a result of his seizure, and the search of his apartment by

ATF agents. After a hearing, on October 22, 2008, this court granted the motion and suppressed the use of the evidence against Montgomery. Thereafter, Green was granted leave to file a motion to suppress, and Green's motion to suppress (Doc. 64) and brief in support thereof (Doc. 65) were filed on December 4, 2008. On December 18, 2008, the government filed a response. (Doc. 69.) On January 14, 2008, the court held a suppression hearing. Accordingly, Green's motion to suppress is ripe for disposition.

### B.   **Factual Findings**

At the suppression hearing the government presented testimony from ATF Agent Ryan Kovach and Pennsylvania State Trooper Eric Guyer. The court credits the candid and undisputed testimony of the agents and makes the following findings of fact:

On December 7, 2007, a sales clerk at Gander Mountain, a sporting goods store in Harrisburg, Pennsylvania, contacted ATF agent Ryan Kovach to report what he believed to be a suspicious purchase of three firearms. Kovach interviewed the clerk, reviewed the surveillance tape of the transaction, and learned the following information: The purchaser, Otis Montgomery, had been accompanied by another individual, who handled the weapons and advised Montgomery about the purchases. The other individual showed particular interest in the Taurus revolver, which Montgomery showed little interest in, but purchased anyway. Altogether, the three weapons cost about $2000, but Montgomery was short of money to pay for them. Montgomery went back to his vehicle with the other individual to retrieve more cash and returned alone. Montgomery paid for the firearms with cash, using twenty dollar bills. Based on these facts, Agent Kovach

suspected that Montgomery purchased the weapons for someone else, which would constitute an illegal transaction known as a straw purchase.

Kovach decided to interview Montgomery about the purchase. Kovach found Montgomery's address by checking the form Montgomery used to purchase the firearms. Montgomery's apartment was located at 713 South George Street, apartment 1b, in York, Pennsylvania. Kovach twice visited the apartment, but was unable to contact Montgomery. However, on one of the trips, Agent Kovach observed a piece of mail sticking out of Montgomery's mailbox in the vestibule to the apartment building. The mail was addressed to Shompre Jones, who Kovach assumed to be Otis Montgomery's girlfriend. Kovach ran a motor vehicle check for Jones and learned that a black Lincoln Navigator was registered in her name.

On December 12, 2007, Agent Kovach returned to the apartment with State Police Trooper Eric Guyer to try to locate Montgomery. Both agents were dressed in plainclothes and carried weapons in holsters under their jackets. After ringing the buzzer to Montgomery's apartment with no answer, the agents returned to their car parked to the rear of the building. The agents noticed a black Lincoln Navigator parked in the lot behind the apartment. Upon checking the license plate, the agents realized it was Jones' vehicle. As the agents were preparing to leave, a silver Lincoln Navigator entered the parking lot and parked next to Jones' vehicle. The agents noticed that the license plate number was one digit off of the license for Jones' vehicle. According to Agent Guyer, this is an indication that the vehicles were purchased at the same car dealership, one after the other. From this, the agents inferred that the individual in the vehicle was associated with Otis Montgomery.

There was only one occupant in the vehicle, a black male in his mid-twenties, later identified as Defendant Tristan Green. The agents observed Green exit the vehicle and walk towards the back of the apartment building. At that point, the agents exited their vehicle and Agent Kovach shouted "Hey Otis" to Green, who responded, "I'm not Otis." Agent Kovach testified that he thought the individual might have been Otis Montgomery because, according to Kovach, he matched the general description of Montgomery. Agent Kovach had previously observed Montgomery on the surveillance tape at Gander Mountain, and knew that Montgomery was a black male in his mid-twenties, and approximately 6'4 in height. By contrast, at 5'11, Green was six inches shorter than Montgomery, and he wore his hair in cornrows, while Montgomery did not. When asked about this discrepancy, Agent Kovach maintained that in his opinion, as a large black male in his twenties, Green matched the general description of Montgomery. Kovach further noted that at this point, he had never seen Montgomery in person.

After Green explained that he was not Otis Montgomery, the agents identified themselves as law enforcement officers and asked Green to produce identification. Green complied, and the agents each examined the identification for a few seconds before immediately returning it to Green. The agents asked Green if he knew Otis Montgomery, and he responded that he did not. Green also told the agents that he did not want any trouble. Agent Kovach told Green that Montgomery was not in any trouble and that the agents wanted to speak to Montgomery. The agents also told Green that they thought he knew Montgomery because of the similarity in the vehicles and license plates. At this point, Agent Kovach testified

4

that he did not know who Tristan Green was and did not suspect him of any involvement in the suspected straw purchase.

Green admitted that he knew Montgomery, and the agents asked him how they could contact Montgomery. Specifically, the agents asked if Green would give them Montgomery's cell phone number. Green responded that he did not have Montgomery's cell phone number. When asked how he usually contacted Montgomery, Green said he goes to the door and knocks. The agents asked Green if he would help them contact Montgomery, and he agreed.

As the agents were speaking to Green, he put his hands in the pocket of his sweatshirt, along the waist of his pants. Agent Kovach told him to keep his hands out of his pockets, and Green complied. Green walked with the agents to the front of the house, with agent Kovach to his left and Agent Guyer following behind. Agent Guyer observed that as Green walked, he held his right arm tight to his body. This indicated to Guyer that Green was carrying something on his waist, possibly a gun.

Montgomery's apartment building was a large house divided up into about four apartments. At the front of the house was a wrap around front porch and an unlocked front door on the porch led to a small vestibule containing mailboxes. Beyond that was another locked door, which led to a large foyer with additional doors leading to separate apartments. As the three reached the porch, Green hesitated and seemed confused about the location of the door. When the agents pointed him to the door, Green looked at it for a few seconds before trying the handle. He seemed surprised that the door was unlocked. Green and the agents entered the vestibule of the apartment, and Green started looking at the buzzers for

the apartments. Green rang a buzzer for a second floor apartment, arousing the suspicions of the agents, who believed that Montgomery lived on the first floor because his apartment number was 1b. When there was no answer, Green told the agents that he usually got in touch with Montgomery by yelling "Yo, Yo, Yo," which he did, but there was no response. Meanwhile, Green repeatedly told the agents he did not want any trouble.

The agents grew increasingly suspicious that Green was being deceptive about his relationship with Montgomery and his knowledge of the apartment building. The agents further suspected that Green was attempting to warn Montgomery of the presence of law enforcement in order to hide Montgomery or prevent the agents from speaking to him. The agents became suspicious because of the following events: Green initially denied but later admitted that he knew Montgomery, despite the connection with the vehicle and his presence at Montgomery's apartment; Green was heading for the back of the apartment before the agents spoke with him and then headed for the front of the apartment with the agents; Green told the agents he did not know Montgomery's cell phone number; Green seemed unfamiliar with the location of the front door and then hesitated at the door; Green rang the wrong buzzer and then shouted for Montgomery in the hallway. Accordingly, as the agents and Green stood in the hallway, Agent Kovach told Green that he thought Green was lying and that the agents knew that Montgomery lived on the first floor. Green responded, "I don't want any problems, this doesn't involve me." At this point, Green reached for his pocket again.

Agent Guyer suspected that Green might be armed. Guyer's suspicion was based on the fact that Green had previously been asked by Agent Kovach to

keep his hands out of his pockets, but put his hands in his pockets again; that Green kept his right arm close to his body while walking to the front of the apartment building; and that the agents were investigating a possible firearms offense.  After Green reached for his pocket again, Guyer told Green that he thought Green's actions were suspicious and that he would pat him down for a weapon.  As Green responded "you have no reason to stop me," Agent Guyer reached towards Green's right waistband where Green had been reaching and immediately felt a firearm.  Guyer pulled the gun out of Green's pocket and exited the vestibule to the front porch to clear the weapon and call for backup.

        The agents testified that although it is not illegal to have a gun, when interviewing someone they know to be armed, the agents usually request that the person hand over the weapon during the interview.  If the individual refuses, the agents either continue the interview while the person is armed, or, if they feel unsafe, discontinue the interview.  Agent Guyer testified that he suspected Green was armed and felt unsafe due to the close quarters of the vestibule and Green's repeated motions towards his waist.

        After Guyer removed the firearm, Green became defensive, and Agent Kovach put his hands on Green's shoulder and told him to calm down.  Kovach intended to detain Green to question him about the firearm.  As Kovach put a handcuff on Green, Green tried to run out the door.  In the meantime, Agent Guyer was clearing the weapon on the porch when he heard a scuffle in the vestibule.  As he turned around, he saw Green running out of the house through the front door.  The agents struggled with Green on the front porch for about five minutes before handcuffing him.  By this time, local police arrived and arrested Green on an

outstanding warrant. The gun that was recovered from Green's waistband was a CZ semiautomatic weapon, which matched the description of one of the firearms purchase by Montgomery. The agents later learned that the gun's serial number also matched that of the firearm purchased by Montgomery.

**II.      Discussion**

Green seeks to suppress the evidence obtained as a result of his encounter with ATF agents on December 12, 2007. The constitutionality of the agents' actions depends upon when Green was seized and the justification for the seizure. The parties dispute whether the initial encounter constituted a seizure, or mere questioning, and whether the subsequent stop and frisk in the vestibule was justified by reasonable suspicion. The court will address these arguments separately.

**A.      Initial Encounter**

Green claims that he was seized by the agents and subsequently searched without reasonable suspicion of wrongdoing. The government asserts that Green was not seized and that the encounter constituted a voluntary encounter rather than an investigatory detention.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. U.S. Const. amend IV. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Florida v. Royer*, 460 U.S. 491, 501–02 (1983). *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991); *California v. Hodari D.*, 499 U.S.

621, 628 (1991). So long as law enforcement officers do not resort to coercive means, they are free to approach an individual, even without individualized suspicion, and ask questions or request identification. *See United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005). As the Supreme Court has observed, "[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also United States v. Crandell*, No. 06-cr-232, slip op. at 9 (3d Cir. Jan. 29, 2009). This standard is an objective one, and regardless of the subjective perception of the individual, a seizure has occurred if a reasonable person in the same circumstances would not have felt free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554–55; *see also Crandell*, slip op. at 9–10.

Here, the court is satisfied that the agent's initial encounter with Green was not a seizure. The agents called out to Green, "Hey, Otis," and Green responded that he was not Otis. Thereafter, the agents identified themselves and requested Green's identification, which he provided. The identification was quickly returned, and the agents then sought and obtained Green's cooperation in contacting Montgomery. Although the agents were armed, they were in plainclothes, their weapons were not displayed, and they never told Green that his cooperation was required. Accordingly, the court finds that the initial encounter until the pat down search was a voluntary encounter and that Green was not seized within the meaning of the Fourth Amendment.

9

In support of his contention that he was seized, Green points to the agents' requests for identification and to keep his hands out of his pockets, and he notes that the agents never told Green that he need not comply with their requests. However, there is no evidence that the two requests were anything other than voluntary requests, not commands, and the court finds that a reasonable person in Green's position would have understood them as such. Additionally, the fact that the officers did not explicitly inform Green that he need not comply with their requests does not mean that Green was coerced or that the encounter constituted a seizure.

### B.  Pat Down Search

On the other hand, there can be no dispute that Green was seized when Agent Guyer conducted a pat down search for a weapon in the vestibule. However, the parties disagree about whether the seizure and search were justified. The government maintains that Green's suspicious behavior during the encounter gave them reason to believe that Green was armed and that criminal activity was afoot, thus justifying the detention and pat down for officer safety pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Green argues that the search was unjustified because the agents had no reasonable suspicion that he was involved in any criminal activity at the time of the search.

In *Terry v. Ohio*, the Supreme Court carved out a narrow exception to the Fourth Amendment's warrant requirement and held that law enforcement officers may conduct a brief, on the street detention of a suspect if there is reasonable suspicion to believe that individual is involved in criminal activity. 392 U.S. at 21–22. Additionally, the officer may perform a pat down search for weapons

where there is reasonable suspicion to believe the individual is armed and poses a danger to the officer or others. *Id.* at 27. However, an officer may not perform a pat down search of an individual who is armed, but who is not reasonably suspected of involvement in criminal activity.[1] *Arizona v. Johnson*, No. 07-1122, slip op. at 1 (U.S. Jan. 26, 2009); *United States v. Ubiles*, 224 F.3d 213, 217–18 (3d Cir. 2000) (holding that the mere fact that officers received a tip that an individual was armed did not provide reasonable suspicion to believe that the individual was involved in criminal activity so as to justify a frisk for weapons); *United States v. Goodrich*, 450 F.3d 552, 560 (3d Cir. 2006) ("It is well established that an officer cannot conduct a *Terry* stop simply because criminal activity is afoot. Instead the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity."). Accordingly, in order for a pat down search to be justified under the Fourth Amendment, the officer must have reasonable suspicion both that (1) the individual to be searched has committed, or is about to commit a crime; and (2) that individual is armed and poses a danger to the safety of the officers or others.

Reasonable suspicion is a less demanding standard than probable cause; however, "the officer must be able to articulate more than an inchoate and

---

[1] The Supreme Court recently reaffirmed that, as a general rule, reasonable suspicion that an individual is involved in criminal activity is required in order to conduct a pat down search. *See Arizona v. Johnson*, No. 07-1122, slip op. at 1 (U.S. Jan. 26, 2009). However, in *Johnson*, the Court held for the first time that an automobile passenger may be frisked for officer safety even if there is no suspicion that individual was engaged in criminal activity, so long as the vehicle was lawfully stopped and the officer has reason to believe that the individual to be searched is armed and presently dangerous. *Id.* at 7. This narrow exception applies only to passengers in automobiles that have been lawfully stopped, and the Court did not alter the general rule that any other pat down search for weapons requires reasonable suspicion that the individual to be searched is involved in criminal activity. *Id.* at 2. Because this case involved no automobile stop, the *Johnson* exception is inapplicable.

11

unparticularized suspicion or hunch of criminal activity." *Ubiles*, 224 F.3d at 217 (internal citations and quotations omitted); *see also United States v. Crandell*, No. 06-cr-232, slip op. at 8 (3d Cir. Jan. 29, 2008). "[I]n justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. In order to evaluate the reasonableness of the officer's suspicion, the court must consider the totality of the circumstances, including, for example, an individual's nervous behavior or evasiveness, and the court must give due weight to the specialized knowledge or training of the officers. *Illinois v. Wardlow*, 518 U.S. 119, 124 (2000); *see also Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003). The reasonable suspicion standard does not require absolute certainty of criminal activity, but it "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 518 U.S. at 124–35; *see also United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002).

Here, there can be no serious dispute that the agents had reason to believe that Green was armed and presently dangerous at the time the pat down search was performed. During the agents' initial encounter with him, Green put his hands in his pockets towards his waistband, prompting the agents to request that he keep his hands out of his pockets during their conversation. Thereafter, Officer Guyer observed Green walking with his right arm tight against his body as though he was holding a firearm in his waistband. Finally, when the agents confronted Green about their suspicions that he was being deceptive about his relationship with Montgomery, Green reached towards his waistband again, as if reaching for a

firearm. Based on these facts, at the time he performed a pat down search, Guyer had reason to believe that Green was armed and presently dangerous.

However, at the time the pat down search was conducted, the agents had no reason to believe that Green was involved in any criminal activity. There is no dispute that Green was not initially the subject of the agents' suspicions. As the encounter with Green progressed, the agents testified that they suspected: (1) that Green was being deceptive about his associations with Montgomery; (2) that Green was attempting to alert Montgomery to the presence of law enforcement in order to hide Montgomery or prevent the agents from interviewing him; and (3) that Green might somehow be involved in the suspicious purchase they were investigating. However, the first two suspicions are not criminal offenses, and the third suspicion is not supported by the facts identified by the agents during their testimony at the suppression hearing.

First, the agents certainly had reason to believe that Green was being less than forthright with them about his relationship to Montgomery and his ability to assist the agents in locating him. After all, Green initially denied, then later admitted knowing Montgomery, and the similarity between Green's vehicle and the vehicle registered to the individual assumed to be Montgomery's girlfriend indicated that the two had some sort of connection. However, as noted above, Green was under no obligation to communicate with the agents at all, let alone volunteer Montgomery's cell phone number or assist the agents with locating him. In a conference call following the hearing, the government suggested that this conduct could constitute a violation of 18 U.S.C. § 1001, which makes it a crime to knowingly and willfully make a false statement. However, this statute only applies to those false statements

that are material, and Green's relationship with Montgomery was not material to the matter the agents were investigating. Even if, as the agents suspected, Green was less than forthright about the extent of his relationship with Montgomery and reluctant to assist the officers in locating him, the court is aware of no criminal statute requiring such cooperation.

As for the second suspicion, the agents testified that they believed Green's actions in the vestibule—shouting "Yo, Yo, Yo" and ringing the wrong buzzer—were an attempt to alert Montgomery, and possibly to help him avoid speaking to the agents. It is not clear whether these facts support the officer's suspicions. Green may indeed usually contact Montgomery by shouting, and he may have been unfamiliar with the location of Montgomery's buzzer. However, even if the agents' suspicions were correct and Green was attempting to warn Montgomery, this action would not constitute a crime. The agents candidly admitted that at the time of the encounter, they were not certain whether a crime had even been committed at Gander Mountain. Although they believed the firearms purchase to be suspicious and intended to further investigate, they had neither a warrant nor probable cause to arrest Montgomery at the time they came to his apartment building to speak with him. It is also important to note that the agents were in plainclothes and not working undercover. While the agents may have reasonably found Green's actions frustrating, the actions did not constitute a crime.

The agent's final suspicion—that Green was possibly involved in the suspicious firearms purchase that the agents were investigating—is without sufficient factual support in the record. Agent Kovach testified at the hearing that initially he did not see Green on the surveillance tape of the purchase at Gander

Mountain.² According to Agent Kovach, the agents' suspicion that Green was involved in an illegal firearms transaction was based on two facts: first, that the agents were investigating a suspicious firearms purchase by a person with whom Green appeared to be associated, and second, that Green was armed. However, these two facts taken together are insufficient to support the inference that Green was involved in the suspicious purchase or that Montgomery's firearms purchase was in fact illegal. It simply does not follow that an armed individual who seems to have some association with a suspected straw purchaser of firearms must himself be involved with that suspected illegal transaction. The two facts identified by the agents do not amount to reasonable suspicion that Green was involved in the Gander Mountain transaction.

    The more difficult question is whether all of the agents' suspicions, taken together amount to reasonable suspicion that Green had committed or was about to commit a crime at the time the agents searched him. The only criminal activity the agents suspected Green may be involved in was the suspected straw purchase of firearms by Montgomery.³ Therefore the court must determine whether Green's deception about his relationship with Montgomery and warning to Montgomery about the presence of law enforcement, taken together with the facts that the agents were investigating a suspected firearms offense by Montgomery and reasonably suspected Green to be armed, constitute reasonable suspicion that Green was involved in the suspected straw purchase. Though a close question, the court

---

² Though Agent Kovach testified that on subsequent review of the surveillance tape after Green was arrested, he saw that Green had been present at the store during the purchase as well.

³ Apart from the three suspicions discussed above, the agents did not identify any other criminal activity they suspected that Green may have been involved in, such as drug activity or assault.

concludes that it does not.  At most, one could infer from Green's behavior that Green believed that Montgomery was involved in criminal activity, and did not want to see Montgomery in trouble with law enforcement.  The agents identified no facts that would support the additional inference that Green himself was a coconspirator with Montgomery in the suspected criminal activity.  In sum, taking all the facts together and considering the totality of the circumstances, the agents lacked reasonable and particularized suspicion that Green had committed or was about to commit a crime.  Accordingly, the pat down search of Green violated the Fourth Amendment.

The court commends the agents for their candor and honesty in describing their actions and suspicions.  Agents Guyer and Kovach found themselves in the frightening position of being in an enclosed space with an individual that they did not trust and who they reasonably believed to be armed and dangerous.  However, the case law is clear on this point:  It is not illegal for an individual to carry a firearm, and the Fourth Amendment does not permit officers to disarm an individual in the absence of reasonable suspicion that the person has committed or is about to commit a crime.  Accordingly, the agents' only options, unappealing as they might be, were to request that Green disarm or terminate the encounter.  The pat down search of Green violated the Fourth Amendment.

### C.   **Application of the Exclusionary Rule**

As a general rule, the appropriate remedy for a violation of the Fourth Amendment is exclusion of the unlawfully obtained evidence from trial.  *Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961).  The purpose of the exclusionary rule is to deter unconstitutional conduct by police by removing an incentive to violate the Fourth

Amendment. *Id*.; *United States v. Calandra*, 414 U.S. 338, 348 (1974). The exclusionary rule applies not only to physical evidence seized, but also to verbal statements which are the product of an unlawful seizure. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *see also Brown v. Illinois*, 422 U.S. 590 (1975).

However, application of the exclusionary rule is not automatic, and the Supreme Court has identified a number of situations in which suppression of unlawfully obtained evidence is not an appropriate remedy for a Fourth Amendment violation. For instance, in *United States v. Leon*, the Supreme Court held that the exclusionary rule should not apply where an officer obtained evidence by relying in good faith upon a search warrant which was subsequently invalidated. 468 U.S. 897, 922 (1984). The Court reasoned that the deterrent effect of suppression in such a case did not outweigh the social cost of excluding the evidence. *Id*. The Supreme Court has subsequently applied the *Leon* analysis and recognized additional exceptions to the general application of the exclusionary rule in cases in which the errors leading to a Fourth Amendment violation were attributable to factors other than police misconduct. *See, e.g.*, *Arizona v. Evans*, 514 U.S. 1 (1995) (court clerk error); *Illinois v. Krull*, 480 U.S. 340 (1987) (officer reliance on a statute later declared invalid); *Massachusetts v. Sheppard*, 468 U.S. 981 (1984) (judge's error in correcting a warrant). The common thread running through all of these cases is the idea that the exclusion of evidence unlawfully obtained by officers relying upon mistakes made by others would serve as no deterrent for police misconduct.

In *Herring v. United States*, the Supreme Court recently extended the this principle for the first time to certain police errors, holding that the exclusionary rule is an inappropriate remedy for Fourth Amendment violations resulting from

17

"isolated negligence attenuated from the arrest." No. 07-513, slip op. at 3 (U.S. Jan. 14, 2009). In *Herring*, the police arrested a defendant based on an outdated warrant that the police had failed to purge from their computer database, and a search incident to the arrest yielded drugs and a weapon. The Court reiterated the principle from *Leon* that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 9. Applying this standard to the facts of the case before it, the Court reasoned that because the police error was "the result of isolated negligence attenuated from the arrest," *id.* at 3, rather than intentional or flagrant misconduct, suppression of the evidence was not likely to deter such errors in the future. *Id.* at 9. Accordingly, the Court held that the exclusionary rule was an inappropriate remedy in that case because the benefits of exclusion were not outweighed by its costs.

    The significance of *Herring* on the application of the exclusionary rule remains uncertain. However, the Supreme Court clearly restricted the reach of *Herring*'s limitation on the exclusionary rule to police misconduct that is "attenuated" from the arrest. Unlike the case at bar, *Herring* involved a computer error by police that was remote in both time and location from the unlawful arrest. By contrast, the unconstitutional conduct at issue in this case was a pat down search of an individual in the absence of reasonable suspicion that the individual was involved in criminal activity, based on the officers' on-the-scene observations. Though the agents' conduct in this case was nowhere near as culpable as that of *Mapp*, it may still be deterred through the application of the exclusionary rule. Accordingly, the court finds that suppression is appropriate, and the firearm and any

inculpatory statements obtained as a result of the unconstitutional pat down search are inadmissible against Tristan Green at trial.

### III.	**Conclusion**

For the foregoing reasons, Green's motion to suppress is granted. An appropriate order will issue.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: January 30, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 1:08-CR-0041 |
| | : | |
| | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| | : | |
| | : | |
| **TRISTAN GREEN** | : | |

## O R D E R

In accordance with the foregoing memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant Tristan Green's motion to suppress is **GRANTED**. The physical evidence seized and inculpatory statements made by Tristan Green following his unlawful seizure and search shall be inadmissible against him at trial.

                                                  s/Sylvia H. Rambo
                                                  SYLVIA H. RAMBO
                                                  United States District Judge

Dated: January 30, 2009.